**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEAMFITTERS LOCAL UNION NO. 420, individually and on behalf of all others similarly situated,**<br>**Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 19-3047** |
| **UNITED BIOSOURCE CORPORATION, now known as UNITED BIOSOURCE LLC, a wholly owned subsidiary of UNITED BIOSOURCE HOLDINGS, INC.,**<br>**Defendant.** | |

**HODGE, J.** **August 17, 2026**

**<u>MEMORANDUM</u>**

## I. INTRODUCTION

This case is a putative class action filed by Plaintiff Steamfitters Local Union No. 420 ("Plaintiff") in 2019 alleging former defendant Mallinckrodt ARD LLC ("Mallinckrodt"), the manufacturer of the prescription drug H.P. Acthar Gel ("Acthar"), and United Biosource Corporation ("Defendant" or "UBC") conspired to remove Acthar from retail distribution, raise its price by over 100,000%, and market it to the purported class for uses and doses unapproved by the FDA. Plaintiff is a third-party payor seeking to recover overpayments for Acthar caused by Mallinckrodt and Defendant's alleged scheme to inflate the price of the drug. Plaintiff's Complaint (ECF No. 1 ("Compl.")) brings claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts 1–2), violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count 3), violations of forty-four states' consumer protection laws (Count 4), negligent misrepresentation (Count 5), aiding and abetting/conspiracy (Count 6), unjust enrichment (Count 7), and declaratory and injunctive relief (Count 8).

Before the Court is Defendant's Rule 12(c) Motion for Judgment on the Pleadings (ECF No. 193 (the "Motion")), Plaintiff's response in opposition thereto (ECF No. 205 (the "Opposition")), and Defendant's reply in further support of its Motion (ECF No. 215). For the reasons that follow, Defendant's Motion is granted.

## II. BACKGROUND[1]

### A. Factual Background

The following allegations are taken from the Complaint, and the Court accepts, as it must, all non-conclusory allegations as true for the purposes of evaluating the Motion.

#### 1. The Parties

Mallinckrodt, a former defendant to this action, manufactures, markets, distributes, and sells Acthar. (Compl. ¶ 2.) Acthar is an adrenocorticotropic hormone, which causes the body to produce cortisone and other steroid hormones. (*Id.* ¶ 42.) Acthar was approved by the FDA on April 29, 1952 for over fifty conditions, but the list of approved conditions was winnowed by the FDA to the present-day nineteen indications on its label. (*Id.* ¶¶ 41, 89.) These nineteen indications include: monotherapy for the treatment of infantile spasms ("IS"), treatment of acute exacerbations of Multiple Sclerosis ("MS"), adjunctive therapy for short term administration for an acute episode or exacerbation of certain Rheumatic Disorders ("RA"), treatment for exacerbation or maintenance therapy of certain collagen diseases, treatment of certain dermatologic diseases, treatment of serum sickness, treatment of symptomatic sarcoidosis, and to induce diuresis or remission of proteinuria in certain types of nephrotic syndrome. (*Id.* ¶ 97.) Indications beyond those listed in the drug's labeling have not been approved by the FDA. (*Id.* ¶ 47.) Acthar is a "specialty pharmaceutical,"

[1] The Court adopts the pagination supplied by the CM/ECF docketing system.

meaning it is not sold or distributed through retail pharmacies and is only distributed through specialty pharmacy distributors and providers. (*Id.* ¶ 4.)

In July 2001, Questcor Pharmaceuticals, Inc. ("Questcor") acquired Acthar from Aventis Pharmaceutical Products, Inc. for $100,000. (*Id.* ¶¶ 3, 176.) Mallinckrodt acquired Questcor for approximately $5.9 billion in August of 2014. (*Id.* ¶ 33.) In October 2020, Mallinckrodt filed for Chapter 11 bankruptcy in Delaware. *In re Mallinckrodt PLC*, Case No. 1:20-bk-12522 (Bankr. D. Del.); (ECF No. 84.) In June 2022, the plan of reorganization confirmed by the Bankruptcy Court became effective and discharged all claims against Mallinckrodt before the effective date, including those in this Complaint. (ECF No. 118 at 2.) On January 17, 2023, the parties to this action stipulated to dismiss Mallinckrodt from the action "with prejudice." (*Id.*)

UBC operates as Mallinckrodt's "hub" of operations for the distribution and payment of Acthar for patients and third-party payors ("TPPs") like Plaintiff. (*Id.* ¶¶ 8, 39.) UBC has been a wholly-owned subsidiary of Express Scripts, Inc. ("Express Scripts"), a pharmacy benefits manager ("PBM"), since 2007. (*Id.* ¶¶ 36, 218.) Express Scripts has also owned CuraScript, Inc. ("CuraScript"), a specialty pharmacy distributor, and Accredo Health Group, Inc. ("Accredo"), a specialty pharmacy provider, since 2004. (*Id.* ¶¶ 4–5.) As a hub, UBC is responsible for controlling Acthar prescription processing, benefits coordination, and payment verification with patients and TPPs. (*Id.* ¶ 39.) UBC acts as Mallinckrodt's "exclusive agent" in the processing and distribution of Acthar prescriptions through the Acthar Support and Access Program ("ASAP"). (*Id.* ¶¶ 16, 38.) Doctors call Acthar prescriptions into the hub, which confirms and authorizes insurance coverage. (*Id.* ¶ 163.) Then, the hub directs CuraScript to deliver the Acthar prescription to the patient. (*Id.*) Express Scripts sold UBC in November 2017 to Avista Capital Partners. (*Id.* ¶ 36.)

Plaintiff is a TPP that provides healthcare benefits, including prescription drug benefits, to its employees through Independence Blue Cross ("IBC"). (Compl. ¶ 28.) IBC coordinates Plaintiff's prescription drug benefits for its employees through Future Scripts, a PBM, but Plaintiff and its beneficiaries pay the full costs of the drugs. (*Id.*) Plaintiff paid $152,798.92 for a total of four prescriptions of Acthar, which were prescribed to a spouse of one of its members for an unspecified rheumatic disorder. (*Id.* ¶¶ 18, 29–30.) The rheumatic disorder for which the beneficiary was prescribed Acthar was not one of the drug's approved indications. (*See id.* ¶¶ 226, 435.)

**2. The "New Strategy"**

In 2007, Mallinckrodt (known as Questcor at the time) and Express Scripts created a so-called "new strategy" for selling, distributing, and marketing Acthar by restricting distribution of the drug to one wholesaler, Express Scripts, to ensure prescription distribution and payment through one source, UBC. (*Id.* ¶¶ 131–32.) This new strategy involved "re-launch[ing]" Acthar with this limited distribution system at a higher price to make it appear as if the product were a new drug "being launched as the only product indicated for IS," which was an "off-label" indication until the FDA approved it in 2010.[2] (*Id.* ¶¶ 152, 184.) Mallinckrodt and UBC would then work to market the drug for additional off-label indications to increase demand for the drug.[3] (*Id.* ¶ 464.) As Plaintiff alleges, the scheme was comprised of three parts: distribution, pricing, and marketing.

---

[2] As defined by the Complaint, "off-label" refers to the use of a drug for any purpose other than what is described in the drug's labeling. (*Id.* ¶ 58.)

[3] The Complaint discusses at length the background of certain members of the Board of Directors of Mallinckrodt (f/k/a Questcor) and their respective departures from the company or financial gains after the "new strategy" was adopted. (*Id.* ¶¶ 120–51.) However, since Mallinckrodt is no longer a party to this suit, these allegations do not have bearing on the merits of Plaintiff's claims, and so the Court does not detail them herein.

*a) The Distribution Scheme*

For decades, Acthar could be distributed to any doctor, hospital, wholesaler, or specialty pharmacy who requested the drug. (*Id.* ¶ 130.) In July 2007, Mallinckrodt changed the way it distributed and sold Acthar by removing Acthar from multiple distributors to just one, CuraScript. (*Id.* ¶¶ 8, 131, 141.) UBC then acted as the exclusive "hub" that processed Acthar prescriptions and coordinated benefits with patients and TPPs. (*Id.* ¶¶ 8, 141.) The goal of this scheme was to restrict Acthar's distribution to one channel controlled by Mallinckrodt and to ensure payment through one source, UBC. (*Id.* ¶ 132.)

As part of the distribution scheme, Mallinckrodt and UBC created the ASAP, for which UBC would act as the exclusive hub. (*Id.* ¶¶ 141, 159.) Under the ASAP, a patient or physician seeking an Acthar prescription is directed to UBC and then required to complete the Acthar Start Form and return it to UBC. (*Id.* ¶¶ 160–62.) The Acthar Start Form requires the patient and physician to authorize the prescription for Acthar as "medically necessary," and to authorize payment to Mallinckrodt. (*Id.* ¶ 165.) The Acthar Start Form was intended to bypass the prior authorization process that is typically used whereby a prescription for Acthar must be reviewed and authorized before the script is filled and charged to the TPP.[4] (*Id.* ¶ 96.) Upon receipt of the Acthar Start Form, UBC then confirms the Acthar prescription with the provider, confirms the patient's insurance coverage, and arranges for the Acthar to be delivered to the patient by CuraScript. (*Id.* ¶ 163.) The Acthar Start Form also authorizes UBC or any other operator of the ASAP to provide Acthar and receive payment for it from the patient and/or the TPP. (*Id.* ¶ 166.) Possession and title to Acthar pass from Mallinckrodt to the patient and TPP after UBC's sign-off

[4] Despite alleging the Acthar Start Form was intended to bypass the prior authorization process and was the only way to obtain Acthar, the Complaint alleges that doctors still used prior authorization forms to obtain Acthar. (*See, e.g.*, *id.* ¶ 384.)

on the Acthar Start Form. (*Id.* ¶ 169.) The Acthar Start Form also authorizes Mallinckrodt and UBC to provide certain services to the patient, including home injection training, which UBC arranges for. (*Id.* ¶ 173.)

Mallinckrodt signed contracts with CuraScript and UBC in June 2007 memorializing this exclusive distribution agreement. (*Id.* ¶ 141.) Mallinckrodt publicly announced that Express Scripts would be its exclusive distributor in July 2007 but did not disclose that all aspects of Acthar distribution, pricing, and sales were being coordinated through UBC. (*Id.* ¶¶ 131, 521(c).)

*b) The Pricing Scheme*

At the time that Questcor acquired Acthar in July 2001, the end payor price or average wholesale price ("AWP") for a vial was approximately $40.[5] (*Id.* ¶¶ 176–77.) In September 2001, Mallinckrodt raised the AWP to $935.20. (*Id.* ¶ 178.) From 2001 until 2007, the Acthar AWP grew from $935.20 to $2,062.79. (*Id.* ¶ 180.) In August 2007, Mallinckrodt agreed with CuraScript and UBC to raise the AWP paid for Acthar by TPPs from $2,062.79 per vial to $29,086.25 in the span of one month. (*Id.* ¶ 11.) Mallinckrodt increased the AWP of Acthar to over $40,000 by 2018. (*Id.* ¶ 201.) Plaintiff alleges that Mallinckrodt "conspired and agreed with UBC" to these price increases, but also states that it was Mallinckrodt that "set" the prices. (*Id.* ¶¶ 210, 331.) UBC coordinated the payment for Acthar at these inflated prices. (*Id.* ¶¶ 331, 344.)

In 2007, Express Scripts' Chief Medical Officer, Steve Miller, stated that "[t]he [price] increase was a manufacturing decision," meaning it was Mallinckrodt's decision, and he "[could not] comment on it." (*Id.* ¶ 219.) In May 2017, Express Scripts' Senior Vice President, Supply Chain and Specialty Pharma, Everett Neville, stated in response to a question during a private investor conference, "I think everybody in our company would agree, that the product is vastly

[5] Plaintiff uses the terms "end payor price" and "AWP" interchangeably. (*See id.* ¶ 178.)

overpriced for the value. We don't set the price. We've told [Mallinckrodt] that. I personally told [Mallinckrodt's] management team that their drug is hugely overpriced. I know Steve has as well." (*Id.* ¶ 221.)

*c) The Marketing Scheme*

The marketing scheme promoted by Defendant and Mallinckrodt allegedly sought to broaden the customer base of Acthar by promoting it for unapproved uses and doses and misrepresenting the efficacy of Acthar.

The Complaint describes Mallinckrodt's "white coat marketing scheme" used for off-label promotion of Acthar for new indications. (*Id.* ¶¶ 270–76.) Through this scheme, Mallinckrodt bribed "key opinion leaders" or "KOLs" from around the country to serve as "spokes-doctors" to promote prescriptions of Acthar for unapproved uses and doses. (*Id.* ¶¶ 244–45, 247, 250.) The KOLs were "paid by Mallinckrodt." (*Id.* ¶ 247.) Mallinckrodt allegedly bribed certain KOLs through compensation for their "loyalty" to the company, including for speaking at various engagements about Acthar's off-label uses. (*Id.* ¶¶ 12, 268–69, 287.) The Complaint details the conduct of specific KOLs in Pennsylvania and throughout the country. (*Id.* ¶¶ 277–385.) These KOLs "work with Mallinckrodt and UBC" to bypass the TPPs' efforts to limit their expenditures on Acthar. (*Id.* ¶ 95.) For example, Plaintiff alleges that certain KOLs, such as Dr. David Mandel, sent letters appealing TPPs' denials of Acthar authorizations to UBC and that these letters contained "false and misleading statements about the limited FDA approval of Acthar and its purported [mechanism of action]." (*Id.* ¶ 285.) UBC received these letters and "vetted" them. (*Id.* ¶ 287.)

KOLs paid by Mallinckrodt also created data to support false and misleading marketing about Acthar's value to treat off-label indications. (*Id.* ¶¶ 244–45.) UBC was "trained with" these

misleading studies and used them to convince patients, providers, and TPPs to use Acthar for unapproved uses and doses. (*Id.* ¶ 305.)

The "white coat marketing scheme" also involved the creation of a new position, Medical Science Liaison ("MSL"). (*Id.* ¶ 239.) MSLs were Mallinckrodt sales employees who were deployed to speak to doctors about the safety and efficacy of Acthar for unapproved uses and doses and to provide periodic training to employees of UBC. (*Id.* ¶¶ 239–40.) The MSLs also promoted a five-day dosing course of treatment to MS patients, which was an off-label use of Acthar. (*Id.* ¶ 243.)

Additionally, the marketing scheme funneled tens of millions of dollars to UBC to run a "patient assistance program" ("PAP") to reduce co-pays for patients. (*Id.* ¶ 12.) The PAP allegedly allowed Mallinckrodt to shift the costs of Acthar to private payors. (*Id.* ¶ 411.) Mallinckrodt paid copay subsidies to a foundation called the Chronic Disease Fund ("CDF") then UBC sent Medicare and private payor patients to the CDF to receive the subsidies, which were used for Acthar to the exclusion of other drugs. (*Id.* ¶¶ 413–14.)[6]

Mallinckrodt also allegedly used UBC's reimbursement specialists as a mouthpiece to deliver false messages about the value of Acthar relative to its price, Acthar's unapproved uses and doses, and its benefits in relation to other treatments. (*Id.* ¶¶ 405–07.) The UBC reimbursement specialists were "directly trained by Mallinckrodt." (*Id.* ¶ 407.) Acthar's mechanism of action is unknown, and the FDA has mandated that this fact be included on the label. (*Id.* ¶ 387.) Despite

[6] The Complaint also includes allegations that Mallinckrodt and UBC misused "long term PAP" funds for a beneficiary of a purported class member, IUOE Local 542, on at least one occasion, when instead the patient should have received funding from a short term PAP. (*Id.* ¶¶ 418–19.) However, IUOE Local 542 has released all of its claims via settlement. *Int'l Union Op. Eng'rs Local 542 v. Mallinckrodt ARD, Inc.*, No. 2018-14059 (Pa. Comm. Pl. Montgomery Cty., Apr. 5, 2024), Dkt. No. 357.

this, UBC provides misleading answers to questions from providers, patients, and TPPs about the mechanism of action for Acthar. (*Id.* ¶ 389.)

**B. Procedural History**

In July 2019, Plaintiff filed this putative class action against Mallinckrodt and Defendant. (ECF No. 1.) The case was assigned to the Honorable Berle M. Schiller. Both Mallinckrodt and Defendant moved to dismiss Plaintiff's Complaint in August 2019. (ECF Nos. 18, 26.) In December 2019, Judge Schiller denied the motions to dismiss in a one-page order, which stated in a footnote, "[a]lthough this may be a situation in which the indirect purchaser rule applies to bar Plaintiffs' RICO claims, the Court cannot yet make that finding as a matter of law at this early stage of this litigation." (ECF No. 57 (the "December 2019 Order").)

Defendant filed its Answer to the Complaint in January 2020. (ECF No. 60.) In October 2020, the case was stayed pending disposition of Mallinckrodt's bankruptcy proceedings. (ECF No. 89.) Mallinckrodt was subsequently dismissed from the case pursuant to its bankruptcy discharge, and the stay was lifted in December 2022. (ECF Nos. 112, 118.)

In August 2023, the case was reassigned to this Court. (ECF No. 131). After receiving briefing and holding a hearing regarding whether the action should be bifurcated based on the potential collateral estoppel effects of the bankruptcy court's decision in *In re Mallinckrodt PLC*, 638 B.R. 57 (Bankr. D. Del. 2021), the Court issued a stay of discovery, as stipulated to by the parties, in October 2024. (ECF No. 139.) In October 2025, the Court issued an order and memorandum lifting the stay and denying Defendant's request to bifurcate, holding that the bankruptcy court's decision did not act as collateral estoppel to Plaintiff's claims. (ECF Nos. 152, 153, 154.) On November 14, 2025, the parties jointly proposed a revised discovery schedule, which this Court approved. (ECF Nos. 155, 166.) The revised discovery schedule set a deadline of June

5, 2026 for the close of fact discovery, October 30, 2026 as the completion date for briefing on class certification, and a hearing on class certification on a date in November of 2026 to be determined. (ECF No. 155.) All other discovery deadlines were based off the Court's class certification determination. (*Id.*) The schedule did not set a trial date. (*Id.*)

On March 27, 2026, Defendant submitted its Motion for Judgment on the Pleadings (ECF No. 193) and a Motion to Stay Discovery Pending Resolution of the Motion (ECF No. 194). After receiving Plaintiff's response to the Motion to Stay, this Court granted the stay on April 10, 2026. (ECF No. 203.) The case remains stayed pending resolution of the Motion for Judgment on the Pleadings.

UBC and its related entities are defendants in multiple lawsuits brought by various other TPPs, including TPPs represented by Plaintiff's counsel in this action. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730 (N.D. Ill. 2019); *Wash. Cty. Bd. of Educ. v. Mallinckrodt ARD, Inc.*, 431 F. Supp. 3d 698 (D. Md. 2020); *United Ass'n of Plumbers & Pipefitters Local 322 of S.N.J. v. Mallinckrodt ARD, LLC*, 2020 WL 5627149 (D.N.J. Aug. 18, 2020). Additionally, this Court recently granted motions to dismiss filed by UBC and other defendants associated with Express Scripts in two related cases brought by Plaintiff's counsel that alleged similar violations to those in this action. *Cty. of Dakota v. United Biosource Corp.*, No. CV 24-4276, 2026 WL 637426 (E.D. Pa. Mar. 5, 2026); *Cleveland Bakers & Teamsters Health & Welfare Fund v. Mandel*, No. CV 24-5303, 2026 WL 912648 (E.D. Pa. Mar. 30, 2026). This Court dismissed the *County of Dakota* and *Cleveland Bakers* plaintiffs' state law claims with prejudice as time-barred and dismissed their federal RICO and antitrust claims without prejudice with leave to amend. *Id.* Plaintiff's counsel, who represented plaintiffs in *County of Dakota*, characterized the

*County of Dakota* complaint as a "carbon-copy" of the Complaint in this action. *Cty. of Dakota v. United BioSource Corp.*, No. 24-cv-04276 (E.D. Pa.) (Dkt. No. 28 at 24–25).

## III. LEGAL STANDARDS

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed according to the same standards as a Rule 12(b)(1) or (6) motion. *See Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019); *Washington v. Gilmore*, No. CV 19-1461, 2022 WL 819302, at *4 (W.D. Pa. Mar. 18, 2022). Under Federal Rule of Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction to hear a claim. *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." *Id*. In evaluating a complaint on a motion to dismiss, the Third Circuit has directed courts do the following: (1) identify the elements of the claim, (2) review the complaint to strike conclusory allegations, and then (3) look at the well-pleaded components of the complaint

and evaluate whether all of the elements identified in part one of the inquiry are sufficiently alleged. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." In order to satisfy Rule 9(b)'s particularity requirement, a plaintiff "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged" and "plead the date, time and place of the alleged fraud, or inject precision into the allegations by some alternative means." *DiMare v. MetLife Ins. Co*., 369 F. App'x 324, 329 (3d Cir. 2010) (citation modified). In short, a plaintiff must provide "the who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotations omitted), *overruled on other grounds by Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir.2008).

## IV. DISCUSSION

### A. Timeliness of Rule 12(c) Motion

The Court first addresses whether Defendant's Motion is proper under Rule 12(c). Plaintiff argues that Defendant's Motion "should be denied for the independent reason that it represents an untimely and improper use of Rule 12(c)" because it was "filed six years into this litigation and on the eve of trial." (Opposition at 7.) A Rule 12(c) motion may be brought anytime "[a]fter the pleadings are closed" so long as it does not "delay trial." Fed. R. Civ. P. 12(c). Plaintiff asserts that the "Court has entered a Case Management Order setting this matter for trial soon." (*Id.*) Not so. As described *supra*, on November 14, 2025, the parties jointly proposed a revised discovery schedule, which this Court approved. (ECF Nos. 155, 166.) The revised schedule did not set a trial

date. (ECF No. 155.) As no trial date has been set, a trial cannot be delayed by the Rule 12(c) Motion. Thus, the Court finds the Motion is timely under Rule 12(c). *See PDX N., Inc. v. Comm'r N.J. Dep't of Lab. & Workforce Dev.*, 978 F.3d 871, 880 (3d Cir. 2020).

**B. Law of the Case**

Federal Rule of Civil Procedure 54(b) preserves this Court's discretion to review interlocutory orders before final judgment, providing that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." The law of the case doctrine cabins the Court's discretion under Rule 54(b). That doctrine, which applies with equal force to "decisions of a coordinate court in the same case as to a court's own decisions," directs courts "to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997) (citation modified). The Supreme Court has held that while "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance . . . courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" C*hristianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 817 (1988) (citing *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)). The Third Circuit has found that such "extraordinary circumstances" that justify departure from a prior decision include "situations in which: (1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Pub. Int. Rsch. Grp.*, 123 F.3d at 116–17.

The Court finds that the law of the case doctrine does not bar its consideration of Defendant's Motion. Defendant argues that the law of the case doctrine does not prevent this Court

from reconsidering the issues decided in the December 2019 Order because (1) that ruling was "clearly erroneous and would work a manifest injustice if allowed to stand" because the Order did not contain any analysis of the issues presented, save for its single sentence on the indirect purchaser rule; and (2) there have been "numerous transformative intervening shifts that have occurred since the prior order issued." (Motion at 15–16.) These "transformative intervening shifts" include the dismissal of Mallinckrodt as a party; the Third Circuit's 2022 decision in *Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342 (3d Cir. Dec. 15, 2022) (non-precedential), which held that direct purchaser status may be resolved on the pleadings; and the issuance of at least five federal district court opinions rejecting similar claims. (*Id.*; ECF No. 215 at 6.) Plaintiff argues that the law of the case doctrine bars the Motion because (1) there is no new evidence available, (2) no supervening new law has been announced, and (3) the December 2019 Order was not clearly erroneous and would not create a manifest injustice. (Opposition at 5–7.)

The parties do not dispute that no new evidence is available. The parties also agree that the *County of Dakota* and *Cleveland Bakers* opinions issued by this Court do not constitute supervening controlling law. (*See* ECF No. 215 at 7.) However, Defendant does argue that *Humana* constitutes intervening law that warrants reconsideration of the December 2019 Order. (Motion at 22; ECF No. 215 at 6.) Although that decision was not precedential, this Court finds that the *Humana* case provides persuasive authority for reconsidering Judge Schiller's decision not to apply the indirect purchaser rule to the Complaint. In *Humana*, the Third Circuit affirmed the district court's dismissal at the pleadings stage of insurers' RICO claims because the insurers' injury was based on their *reimbursements* of the insureds purchases of Suboxone film. 2022 WL 17718342, at *3. Because the injury the insurers suffered was from the "reimbursed prescriptions,"

the court found the insurers suffered no direct injury from the defendant's alleged RICO scheme. *Id.* Therefore, the indirect purchaser rule applied to bar the insurers' claims.

The December 2019 Order in this action noted that the Court could not yet make a "finding as a matter of law" as to the applicability of the indirect purchaser rule at the pleadings stage of the litigation. However, *Humana* is intervening law where the Court did make such a finding at this stage, and indeed, as discussed *infra*, this Court does find that the indirect purchaser rule as articulated in *Humana* applies. The *Humana* decision thus constitutes supervening new law that, although non-precedential, is sufficient to trigger an "extraordinary circumstance" warranting reconsideration of this Court's previous Order under the law of the case doctrine.

"The law of the case doctrine . . . acts to preclude review of only those legal issues that the court in a prior appeal actually decided, either expressly or by implication; it does not apply to dicta." *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998). Because the December 2019 Order only "actually decided" the issue of application of the indirect purchaser rule, the law of the case doctrine does not act to bar this Court's review of other legal issues presented in Defendant's Motion.

**C. Federal RICO (Counts 1 & 2)**

Plaintiff brings claims for violation of RICO and conspiracy to violate RICO under 18 U.S.C. § 1962(c) and (d) (Counts 1 & 2). To state a RICO claim, a plaintiff must plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A claim of a pattern of racketeering activities requires at least two predicate acts of racketeering activity. *Kolar v. Preferred Real Est. Invs., Inc.*, 361 F. App'x 354, 362 (3d Cir. 2010). Here, Plaintiff alleges the predicate acts of mail fraud and wire fraud. 18 U.S.C.

§§ 1341, 1343; (Compl. ¶ 487). The elements of a mail fraud claim are "(1) a scheme or artifice to defraud for the purpose of obtaining money or property and (2) use of the mails in furtherance of the scheme." *United States v. Rashid*, 39 F. Supp. 3d 649, 653 (E.D. Pa. 2014), *aff'd sub nom. Rashid v. Warden Phila. FDC*, 617 F. App'x 221 (3d Cir. 2015). The elements of wire fraud are "(1) knowing and willful participation in a scheme or artifice to defraud, (2) with specific intent to defraud, and (3) use of interstate wire communications in furtherance of the scheme." *Id.* (internal quotations omitted).

Plaintiff's RICO claims fail to pass muster. The insufficiency of Plaintiff's RICO claims is two-fold. First, the indirect purchaser rule bars Plaintiff's claims as pled. Second, Plaintiff has failed to plead a fraudulent misrepresentation or omission to support the predicate acts of mail and wire fraud with the particularity required under Rule 9(b).

**1. Indirect Purchaser Rule**

As discussed *supra*, the Third Circuit held in *Humana* that a Court may dismiss claims on the pleadings based on application of the indirect purchaser rule. 2022 WL 17718342, at *3. The Court finds here that the indirect purchaser rule precludes Plaintiff's RICO claims as pled. Indirect purchasers, who bring claims for the portion of an alleged overcharge that has been "passed on" to them by a direct purchaser, lack standing to assert RICO claims. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 847–48, 855 (3d Cir. 1996) (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 744 (1977)). The *Humana* court affirmed a district court's dismissal of insurers' RICO claims based on their alleged injuries resulting from reimbursements they issued to their insureds for Suboxone after "wholesalers and retailers passed on the inflated prices of Suboxone to the[m]." 2022 WL 17718342, at *2–3 (citation modified). The Third Circuit found that the allegations "fit[]

the description of a 'third-party payor' who is barred from recovery in a RICO action by the indirect purchaser rule." *Id.* at *2.

Plaintiff's Complaint contradicts itself as to whether Plaintiff is a direct or indirect purchaser of Acthar. (*Compare* Compl. ¶ 595 ("indirect purchasers of prescription drugs, like Plaintiff and the Class . . . ."), *with id.* ¶ 170 (alleging Plaintiff makes co-payments "directly back to Mallinckrodt").) Plaintiff argues in its Opposition that the Complaint alleges a "direct overcharge," yet the Complaint asserts that CuraScript, which is not a party to this suit, was the exclusive purchaser of Acthar, and also describes Plaintiff's payments for Acthar as "reimbursements," presumably made to IBC, its PBM. (*See, e.g.*, *id.* ¶¶ 8, 12, 28, 498, 699.) When faced with these contradictions, Plaintiff's Opposition is conspicuously vague. Plaintiff's Opposition does not dispute its own admissions in the Complaint that it is an "indirect purchaser" and that CuraScript was the only direct purchaser of Acthar, but instead argues that the Court "must read the pleading as a whole, not seize upon a single label while ignoring the surrounding allegations of direct economic injury, reimbursement obligations, and Defendant's role in the transactional scheme at issue here." (Opposition at 12.) While it is true that the Court reads Plaintiff's Complaint as a whole, the allegations must be "facially plausible." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Plaintiff's self-contradictions with respect to its own purchaser status lead this Court to find that the RICO allegations do not plausibly plead standing.

Plaintiff argues that "*Humana* does not authorize a court to resolve disputed payment mechanics, contractual relationships, and causation issues on the pleadings when the Complaint alleges a direct overcharge and a direct injury-producing reimbursement structure." (Opposition at 12.) Plaintiff again contradicts itself. Were Plaintiff's payments for Acthar "direct overcharge[s]" or "reimbursement[s]"? Plaintiff may not simply assert that determination of the indirect purchaser

rule's application is "too fact-based" and thus survive the Motion. (Opposition at 12.) The burden of pleading facts that plausibly suggest Plaintiff has standing to sue rests squarely with Plaintiff. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) ("The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the[] elements [of standing]."); *Berg v. Obama*, 586 F.3d 234, 238 (3d Cir. 2009). Plaintiff has failed to carry that burden, and thus the RICO claims are dismissed with leave to replead.

**2. No Fraudulent Misrepresentation or Omission**

Plaintiff's RICO claims are separately deficient for their failure to plead a fraudulent misrepresentation or omission with the particularity required under Rule 9(b). *See Marangos v. Swett*, 341 F. App'x 752, 756 (3d Cir. 2009). Nor does Plaintiff identify the "who, what, when and where details" of the alleged fraud, as required by Rule 9(b). *See DiGiglio v. U.S. Xpress, Inc.*, 293 F. Supp. 3d 522, 527 (E.D. Pa. 2018), *aff'd*, 2018 WL 11449580 (3d Cir. Apr. 24, 2018). At the outset, the Court notes that Plaintiff's allegations about misrepresentations made by Mallinckrodt do not support the RICO claims, as UBC is the only remaining Defendant in this action. Striking those allegations, the Complaint is deficient in describing any misrepresentation or omission made by UBC through the "white coat marketing scheme" or the pricing scheme that could support a scheme or artifice to defraud under the mail and wire fraud statutes.

The Complaint does not describe with sufficient particularity UBC's role in the alleged "white coat marketing scheme" that used MSLs and KOLs to promote prescriptions of Acthar for unapproved uses and doses. As alleged, it was Mallinckrodt that paid the KOLs and MSLs for their work to promote prescriptions of Acthar for off-label uses and doses, not UBC. Plaintiff alleges that MSLs and KOLs trained UBC using misleading messages and studies about the safety and efficacy of Acthar for unapproved uses and doses, which UBC utilized to promote off-label use of

Acthar to patients, providers, and TPPs. However, the Complaint does not describe with sufficient specificity how these misleading messages and studies passed on from MSLs and KOLs were communicated to Plaintiff by UBC.[7] The Complaint also alleges that Mallinckrodt trained UBC reimbursement specialists to deliver allegedly false messages to patients and TPPs about the value of Acthar relative to its price, its off-label uses and doses, its benefits in relation to other treatments, and Acthar's mechanism of action. However, once again, Plaintiff fails to provide any specificity regarding the "who, what, when, and where" of the statements that the reimbursement specialists made to Plaintiff. Moreover, as this Court held in *County of Dakota*, off-label marketing is not per se fraudulent, and Plaintiff has failed to identify a particular fraudulent statement by UBC concerning Acthar and its approved indications. 2026 WL 637426, at *11.[8]

With respect to the Complaint's allegations that UBC defrauded Plaintiff based on the alleged pricing scheme, the Court finds, as it did in *County of Dakota* and *Cleveland Bakers*, that

---

[7] The Complaint also alleges that UBC received and "vett[ed]" letters from one KOL, Dr. Mandel, appealing TPPs' denials of authorizations for Acthar. Plaintiff alleges that these letters by Dr. Mandel contained false and misleading statements about the FDA's approval of Acthar and its mechanism of action. Even if these allegations did provide the requisite details of "who, what, when, and where" under Rule 9(b), which they do not, Plaintiff fails to allege what it means that UBC "vett[ed]" these letters or why that is sufficient to attribute Dr. Mandel's misrepresentations to UBC.

[8] Defendant claims that "Plaintiff purchased Acthar for an admittedly on-label indication" because the Acthar Plaintiff paid for was to treat one of its beneficiaries for rheumatic disorder, and the Complaint admits that Acthar is FDA-approved for certain "Rheumatic Disorders." (Motion at 19.) However, the Court disagrees with this characterization. Although Plaintiff vaguely alleges that its beneficiary received Acthar for an unspecified "rheumatic disorder," the Complaint alleges that Acthar is approved for certain specified "Rheumatic Disorders," rather than all rheumatic disorders. (Compl. ¶ 97.) Because Plaintiff has not specified what rheumatic disorder its beneficiary had, the Court cannot affirmatively conclude that Plaintiff purchased Acthar for an FDA-approved use. However, the Court advises Plaintiff that, should it seek to replead its claims based on off-label marketing, the amended complaint should allege with particularity that Plaintiff's purchase of Acthar was for an off-label indication in order to show its injury was proximately caused by off-label marketing. *See City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 774–75 (N.D. Ill. 2019) (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)).

charging high prices is not, in and of itself, an actionable misrepresentation or omission. *Cty. of Dakota*, 2026 WL 637426, at *12 (collecting cases). More fundamentally, Plaintiff's allegations are inconsistent as to what role UBC had in setting Acthar's price because the Complaint alleges multiple times that it was Mallinckrodt that "set" Acthar's prices. (*See, e.g.*, Compl. ¶¶ 210, 219, 221, 331.) Even if UBC did have a role in setting Acthar's price by somehow vaguely "agree[ing]" to raise the prices, Plaintiff has failed to identify a misleading statement made by UBC about the price of the drug. (*See id.* ¶ 714.) Plaintiff's RICO claim is therefore dismissed to the extent that it is based on fraudulent pricing.

Finally, Plaintiff must show proximate cause to successfully allege a RICO violation, which requires a direct relation between the injury and the injurious conduct. *Holmes*, 503 U.S. at 268. Plaintiff has failed to allege with any specificity that UBC made misrepresentations directly to Plaintiff and that Plaintiff relied on those misrepresentations in purchasing Acthar. *See City of Rockford*, 360 F. Supp. 3d at 775 (collecting cases). Indeed, Plaintiff makes no factual averments about what information it ever received from UBC, and such information is presumably within its own possession and control. Therefore, Plaintiff's RICO claims are also dismissed for failure to plead proximate causation.

Because the Court finds Plaintiff has failed to state a claim for violation of the RICO statute under § 1962(c), its claim for conspiracy to violate RICO under § 1962(d) must also fail. *See Lum v. Bank of Am.*, 361 F.3d at 227 n.5 ("Any claim under § 1962(d) based on an alleged conspiracy to violate the other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient.").

**D. UTPCPL and Negligent Misrepresentation Claims (Counts 3 & 5)**

"To survive a motion to dismiss, a UTPCPL claim requires: (1) the defendant's unfair practices, (2) an 'ascertainable loss' that the defendant's unfair practices caused, and (3) facts which suggest the plaintiff's reliance on the defendant was justifiable." *Fike v. Glob. Pharma Healthcare Priv., Ltd.*, 741 F. Supp. 3d 265, 278 (E.D. Pa. 2024). "A plaintiff must allege that he purchased the product because he heard and believed the defendant's false advertising." *Id.* at 279 (citing *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (2001)). Similarly, to plead negligent misrepresentation a plaintiff must demonstrate: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). Justifiable reliance is an essential element of both UTPCPL and negligent misrepresentation claims under Pennsylvania law. *See Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399–400 (E.D. Pa. 2008).

Here, Plaintiff pleads *no specific allegations* that suggest how or when it heard, let alone relied, on Defendant's alleged misrepresentations in purchasing Acthar. In fact, the Complaint does not contain any allegations as to what communications Defendant had with Plaintiff, when, or how those communications occurred. As discussed *supra*, Plaintiff alleges that it purchased Acthar for its beneficiary's "rheumatoid disorder," which was purportedly an off-label use, but fails to specify what that rheumatoid disorder was, and what purportedly misleading or deceptive statements by Defendant induced Plaintiff to purchase Acthar for this beneficiary. Plaintiff asserts that whether reliance is justifiable is generally a question of fact for the jury. (Opposition at 14.) However, Plaintiff is still required to plead reliance for its UTPCPL and negligent

misrepresentation claims under Rule 8.[9] Plaintiff's UTPCPL and negligent misrepresentation claims fall far short of Rule 8's pleading requirement and are therefore dismissed.

**E. Claims Based on Other States' Consumer Protection Laws (Count 4)**

In class action cases, "Article III must be satisfied by at least one named plaintiff" and "for each claim he seeks to press." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015) (citation modified); *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). Harm to unnamed class members is insufficient to demonstrate standing. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Plaintiff argues that "questions about whether it may represent class members asserting related claims under the laws of other states ordinarily overlap with Rule 23 issues and are frequently addressed at class certification, not on the pleadings." (Opposition at 16.) However, "considerations under Rule 23 . . . rarely can be antecedent to the question of whether a federal court has jurisdiction to hear a claim at all." *Neale*, 794 F.3d at 360. Therefore, the Court assesses whether Plaintiff has standing to bring its class claims based on forty-four other states' consumer protection laws.

Plaintiff is a Pennsylvania union that represents Pennsylvania workers. (Compl. ¶¶ 26–27.) Benefit plan plaintiffs who "bring suit regarding their reimbursement of members' purchase of drugs" lack standing to assert state law claims in "states where they are not located and where they

---

[9] Plaintiff asserts that Rule 9(b) does not apply to its deception claims under the UTPCPL. (Opposition at 14.) The Court declines to make a determination at this stage what pleading standard applies to the UTPCPL claim because the claim does not meet either one. *See Kemezis v. Matthews*, 394 F. App'x 956, 958–59 (3d Cir. 2010) (discussing disagreement in Pennsylvania courts and district courts in this circuit regarding whether claims under the UTPCPL's catchall provision must be pled according to Rule 9(b)'s particularity standard and declining to resolve the question because Plaintiff "failed to allege a plausible claim for relief even under the more lenient standards of Rule 8").

did not purchase any drugs or reimburse their members for the purchase of any drugs." *Plumbers' Loc. Union No. 690 Health Plan v. Apotex Corp.*, No. CV 16-665, 2017 WL 4235773, at *13 (E.D. Pa. Sept. 25, 2017). The Complaint contains no facts connecting named Plaintiff or its injury to any of the forty-four states listed in Count 4. Because Plaintiff has not demonstrated it has Article III standing to bring claims under any of the other forty-four states' consumer protection laws, these claims are dismissed under Federal Rule of Civil Procedure 12(b)(1).[10]

### F. Aiding and Abetting/Conspiracy (Count 6)

Plaintiff alleges that UBC aided and abetted Mallinckrodt in its "schemes by serving as the HUB and direct interface with patients and payors to ensure that Acthar prescriptions were filled and paid for at inflated AWPs as set by Mallinckrodt." (Compl. ¶ 718.) The Complaint further alleges that Mallinckrodt and UBC conspired to "negligently misrepresent[] the truth about Acthar," violate consumer fraud laws, and "defraud and deceive the Plaintiff and the Class by causing it to pay more for Acthar than it otherwise would have paid." (*Id.* ¶¶ 712, 715.) However, as established above, Plaintiff has failed to allege claims for negligent misrepresentation or violation of consumer fraud laws. "No civil cause of action for conspiracy can exist unless the conduct that was the subject of the conspiracy is actionable." *Morley v. Farnese*, 178 A.3d 910, 919 (Pa. Commw. Ct. 2018). The same is true of an aiding and abetting claim. *See Liberty Mut. Grp., Inc. v. 700 Pharmacy, LLC*, 270 A.3d 537, 555 (Pa. Super. Ct. 2022) (affirming dismissal of

[10] The Court also notes that, as Defendant argues in its Motion, Count 4 contains no allegations against UBC at all; Plaintiff only alleges that "Mallinckrodt violated the consumer protection laws of all other states . . . ." (Motion at 29; Compl. ¶ 528.) Plaintiff does not address this argument in its Opposition, which alone is enough for this Court to dismiss the claim. *Barrick v. Perry Cnty. Prison*, No. 22-cv-1432, 2023 WL 4631658, at *1 n.2 (M.D. Pa. July 19, 2023) ("A brief in opposition to a motion to dismiss that fails to respond to a substantive argument to dismiss a particular claim results in the waiver or abandonment of that claim." (citing *Dreibelbis v. Scholton*, 274 F. App'x 183, 185 (3d Cir. 2008))).

aiding and abetting claim where plaintiff failed to establish underlying tort). Because Plaintiff has failed to allege a tort underlying its aiding and abetting/conspiracy claim, that claim must be dismissed.

### G. Unjust Enrichment (Count 7)

Under Pennsylvania law, "[t]o succeed on an unjust enrichment claim, the plaintiff must prove: (1) benefits were conferred on the defendant by the plaintiff; (2) appreciation of such benefits by the defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of value." *Liberty Mut. Grp.*, 270 A.3d at 554 (citation modified). The Complaint is unclear as to whether the unjust enrichment claim is against UBC or just Mallinckrodt. (*See* Compl. ¶ 723 ("This Count alleges unjust enrichment against Mallinckrodt.").) To the extent that this claim may be construed as against UBC, Plaintiff alleges that the benefit conferred on UBC was through Mallinckrodt's compensation of UBC out of the funds Mallinckrodt received from the reimbursement rates it charged Plaintiff. (*Id.* ¶ 725.) However, Plaintiff fails to allege that UBC's compensation increased as a result of Mallinckrodt's alleged overcharging for Acthar and therefore fails to allege that the benefit of overpayments for Acthar was actually "appreciated" by UBC. *See Telwell Inc. v. Grandbridge Real Est. Cap., LLC*, 143 A.3d 421, 428 (Pa. Super. Ct. 2016) (affirming lower court dismissal of unjust enrichment claim where defendant did "not retain any direct benefit conferred" based on co-defendant's overcharging of plaintiff).[11] Plaintiff's unjust enrichment claim is thus dismissed for failure to allege that UBC benefitted from Plaintiff's alleged overpayment for Acthar.

[11] Once again, Plaintiff also failed to address this argument, which was raised by Defendant's Motion, in its Opposition. (*See* Motion at 27–28.) This alone warrants dismissal of the unjust enrichment claim. *See Barrick*, 2023 WL 4631658, at *1 n.2.

### H. Declaratory and Injunctive Relief (Count 8)

Because Plaintiff's substantive federal and state law claims fail, as discussed *supra*, its request for declaratory and injunctive relief based on these claims (Count 8) necessarily fails as well. *See Ally Fin., Inc. v. Mente Chevrolet Oldsmobile, Inc.*, No. CIV.A. 11-7709, 2012 WL 4473240, at *9 (E.D. Pa. Sept. 28, 2012). If Plaintiff chooses to replead its federal and state law claims, the Court will decide at that time whether declaratory and injunctive relief are proper.

## V. CONCLUSION

For the reasons discussed herein, the Court hereby grants the Motion and dismisses all counts without prejudice. The Court grants Plaintiff leave to replead within twenty-one days to correct the deficiencies as noted in this opinion. An appropriate order follows.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**